UNITED STATES of America,
Plaintiff,

v.

Rafael MARTE, Defendant.

Criminal No. 02–278(DRD).

United States District Court,
D. Puerto Rico.

Feb. 28, 2004.

Ramon L. Garay–Medina, Garay Medina Law Office, San Juan, PR, for Defendant.

Daniel J. Vaccaro, United States Attorney's Office, Pretrial Services, U.S. Pretrial Services, U.S. Marshal, U.S. Marshal Service, U.S. Probation, U.S. Probation Office, San Juan, PR, for Plaintiff.

## AMENDED OPINION AND ORDER

DOMINGUEZ, District Judge.

### PRELIMINARY PROCEEDINGS

Defendant Rafael Marte pled guilty on February 27, 2003, (Docket No. 57). He pled guilty to Count I of the indictment. Said count charged the defendant with a conspiracy to possess with intent to distribute in excess of five (5) kilograms of cocaine, a Schedule II Controlled Substance, in violation of Title 21 U.S.C. § 841(a)(1) and 846. As part of the plea agreement the parties agreed that defendant would be entitled to be sentenced below the statutory minimum of ten years and could reduce the base offense level by two points under U.S.S.G. § 3B1.2 should defendant meet all the requirements of the safety valve set forth at 18 U.S.C. § 3553(f)(1–5). These requirements are the following:

1. The defendant does not have more than 1 criminal history point . . .

2. The defendant did not use violence or credible threats of violence or possess a firearm or other dangerous weapon (or induce another participant to do so) in connection with the offense;

3. The offense did not result in death or serious bodily injury to any person;

4. The defendant was not an organizer, leader, manager, or supervisor of others in the offense . . . and was not engaged in a continuing criminal enterprise . . . ;

5. And not later than the time of the sentencing hearing, the defendant has truthfully provided to the Government all information and evidence the defendant has concerning the offense or offenses that were part of the same course of conduct or of a common scheme or plan . . .

18 U.S.C. § 3553(f), U.S.S.G. § 5C1.2

See generally *United States v. Ortiz–Santiago 211 F.3d 146, 150–151 (1st Cir. 2000).*

Defendant was debriefed on May 27, 2003, (Ex. 1 U.S.A.), and then again on August 7, 2003 (Ex. 2 U.S.A.). The second request resulted from a motion filed by defendant Marte before the beginning of the original sentencing hearing date to resubmit to a further debriefing. (Docket Nos. 116–117.)

Subsequently the court held hearings on August 20, 2003, (Docket No. 135, Transcript); August 21, 2003, (Docket No. 136 Transcript); and August 26, 2003, (Docket No. 137), all officially docketed on October 20, 2003. The hearings were held because the United States insisted that notwithstanding having granted the defendant a second opportunity to disclose all information and evidence concerning the offense, co-defendant continued to withhold material information and hence the court should decline a finding of compliance under the safety valve provisions.

## THE SAFETY VALVE LAW

■ The parties are in agreement that defendant complies with the first four of the required criteria set forth under U.S.S.G. § 5C1.2, adopting the requirements limned at 18 U.S.C. 3553(f).[1] The disagreement is as to the fifth criteria, that is whether or not defendant truthfully provided the government all information concerning the offense. It is the court, not the government, nor the defendant, who must determine compliance with the safety valve. 18 U.S.C. 3553(e), *United States v. Montañez*, 82 F.3d 520, 523 (1st Cir.1996); *United States v. Ventura Cruel*, 133 F.Supp.2d. 138, 140–141 (D.C.PR 2001). The standard for compliance of that criteria is set forth at *United States v. Matos*, 328 F.3d 34, 39–40 (1st Cir.2003): *"... we have made it pellucid that nothing short of truthful and complete disclosure is a condition precedent to relief under the safety valve ... a safety valve debriefing is a situation that cries out for straight talk; equivocations, half truths and veiled allusions will not do."*

■ The deadline for compliance with the safety valve is "the moment the sentencing hearing starts." *United States v. Matos*, 328 F.3d at 39. The defendant bears the burden of showing full and timely disclosure. *United States v. Márquez*, 280 F.3d 19, 25 (1st Cir.2002); *United States v. Matos, 328 F.3d at 39.* The defendant has the burden because he is requesting a departure from the standard in this case a mandatory ten-year sentence. *United States v. Ramirez*, 94 F.3d 1095, 1100–1002 (7th Cir.1996). Further, pursuant to the mandate of the case of *United States v. Matos*, 328 F.3d at 42, the omissions of defendant as truthfulness must be relating to "material facts" not

merely "trivial inconsistencies" or "inconsequential omissions" or merely that the matter is a "bonafide misunderstanding."

■ Finally, the court is required to make fact specific credibility determinations. The court must provide in safety valve cases more than "bare conclusions for support." "Absent either specific factual findings or easily recognizable support in the record, the safety valve cannot be avoided." *United States v. Miranda–Santiago*, 96 F.3d 517, 528–530 (1st Cir.1996).

## THE FACTS

In the instant case the controversy is heavily fact bound. The court has analyzed the three transcript volumes, (Dockets Nos. 135–137). First, the court expresses the facts as claimed by defendant and his witness co-defendant Quintero and then the facts pursuant to the version of co-defendant David Coxon a.k.a. Richard Ward (Gringo/Americano) and Agent José L. Prendes. The court further takes into consideration and narrates the salient part of the rebuttal testimony of the defendant and the Agent. Finally, the court makes the credibility determinations.

## RAFAEL MARTE

Defendant alleges that he has fully complied with providing to the United States all he knows about two deliveries of drugs which he made and the pick-up of twenty kilos of cocaine at Las Croabas, P.R. the date of arrest. One delivery involved five kilos of cocaine about one week prior to the date of his arrest on June 27, 2002, and a further delivery of ten kilos the date of his arrest. He also disclosed a two-kilo transaction that occurred between the five and ten-kilo transaction which he did not

---

1. At the second debriefing co-defendant revealed a two-kilo transaction not revealed in

the first debriefing.

personally participated in but became aware after the first debriefing. He further disclosed that he was to pick-up twenty kilos in Las Croabas on June 27, 2002, where he was to meet a "Gringo" ("Americano") Richard Ward,[2] who was to deliver the kilos to him. He was also to deliver to "Richard" Ward, Gringo/Americano, a duffle bag of money in payment for the drugs. Participating with him in the first two transactions were José Lucia Henriquez, known as "San," Ana María Carela, and Leonidas Quintero, also known as Leo, who introduced him to drugs. Miguel, El Negro, (a non-arrested co-defendant), was the person who originally provided the drugs to them according to the version of defendant Marte, (Tr. p. 11–13, D.135). El Negro was the person that originally offered defendant Marte and Quintero to "take woman for a ride" referring to moving drugs.

Marte at the time of the conspiracy was living with his common law wife; Quintero lived in a separate apartment but within the dwelling of Quintero, (Tr. p. 17–18, D.135). Marte and Quintero knew each other since November of 2000, (Tr. p. 4, D.136). The initial drug transaction of five kilos of cocaine provided by El Negro to Marte/Quintero was to be delivered to José Lucia Henriquez on instructions from Miguel, El Negro. Marte delivered two kilos to José Lucia Henriquez and later Quintero delivered three kilos to him. All the money went to El Negro, delivered by Quintero, (Tr. p. 19–22, D.135). (See also Tr. p. 35–36, D. 135.) The drug bricks had a markings of "Amigo" on them. Defendant Marte was aware of a two-kilo transaction but had no specific knowledge about it. (Tr. p. 37, D.135.) A ten-kilo transaction occurred on the date of his arrest on June 27, 2002. He received ten kilos from Miguel, El Negro, on the morning of June 27, 2002, at Plaza Norte Shopping Center. These ten kilos also had markings of "Amigo" on the brick kilos. He received money in a paper bag and money in a back pack. Ten kilos were to be delivered to José Lucia Henriquez. Seven kilos were actually delivered to José Lucia Henriquez and three to the apartment of María Carela. The three kilos were stored with paper bag money in a white paint bucket stored in María Carela's apartment. (These were later seized by DEA.) The money in the back pack was to be delivered to the person in Las Croabas, Fajardo, who would provide twenty kilos of cocaine. He was known as Richard (El Gringo/ Americano), also known as Richard Ward, whose true identity was to be David George Coxon. (Coxon transported the drugs in a sail boat from St. Marteen via Tortola, British, Virgin Island, to Culebra and then Las Croabas, Fajardo, P.R.) (Tr. p. 37–41, D.135.) Marte proceeded that afternoon of June 27, 2002 to Las Croabas, Fajardo with María Carela and Leonidas Quintero to pick up the twenty kilos. He went to Las Croabas on Saturday June 27, 2002 and identified Richard Ward. ("When I got to Las Croabas I became aware of a person with the description that they had given me. I stopped and I made a signal. He crossed the street asked us: 'Quintero, Rafa.'") (Tr. p. 29–30, D.135.) Prior thereto he had stated that Negro ordered him and Quintero to deliver the money in the bag to El Gringo and pick up twenty kilos all in Las Croabas. He was to deliver $185,000.00 to a man in Las Croabas "wearing short pants, a skirt and sun glasses." (Tr. p. 27, D.135.) The kilos picked up by Marte and Quintero that afternoon again had "Amigo" markings. He was arrested after he was delivered the ten kilos from Richard Ward (Gringo/Am-

---

2. Richard Ward's real name is David George Coxon.

ericano) at Las Croabas (Tr. p. 41–47, D.135).

At the second debriefing on August 7, 2003 the defendant clarified some details as to the five-kilo transaction, as to the ten-kilo transaction, as to a two-kilo transaction wherein he did not participate, and as to the pick-up of the twenty kilos. However, no other transaction was disclosed. Marte specifically claimed not having been to Las Croabas before the date of his arrest on June 27, 2002, (Tr. p. 44–46, D.135).

The issue is precisely that the United States contends that the defendant went to Las Croabas around one week prior to June 27, 2002, on June 22, 2002, to pick-up fifty-four kilos of cocaine with Mr. Quintero and Miguel, El Negro. The matter involves to the court strictly an issue of credibility.

## LEONIDAS QUINTERO

Leonidas Quintero testified on behalf of defendant Marte on August 21, 2003, (D.136). The court does not spend too much time narrating the facts as to the original five, two, and ten kilo transactions since said disclosure is totally **undisputed** by the United States. The **critical** transaction is the transaction of June 22, 2002, and whether or not co-defendant Marte participated in this initial drug transaction.

After examining the three volumes of testimony, (Dockets 135–137), the court, however, found curious and interesting the protection provided by co-defendant Marte and co-defendant Quintero to co-defendant María Carela.

For example, as to the drug transaction of three kilos (part of the ten-kilo transaction) that was delivered to María Carela by Marte, Quintero states that the three kilos and the money inside the paint bucket was placed in the apartment of María Carela

while she was not there. Marte had keys of María Carela's apartment, (Tr. p. 18–19, D.136).

On the two-kilo delivery that Marte did not know the details, Quintero also protects María Carela the following way:

Q: An you delivered it to San (José Lucia Henriquez) (referring to the two kilos).

R: Yes, Sir. Well not me exactly no. I made the delivery, but when I went back waiting for San and that I had already had them. I would usually go to Marianelli Carela's house (María Carela). And I was there at María Carela's house when Lucia arrived. And I told her as a favor when I was going to drop the keys to him, so that he would hand me a bag that was in the trunk of the car for me to give him the keys so he would pick it up.

The court: That is a strange way of answering yes or no."

(Tr. p. 24–25, D.136).

This answer to the court is protective of María Carela since the drugs apparently were delivered to her and she then delivered them to "San." In cross examination Quintero admitted that the two kilos were in Marte's car. Quintero had keys to Marte's car; these drugs also had "Amigo" markings, (Tr. p. 35, D.136). Quintero further clarified that he asked María Carela while she was going down to the parking from her apartment to take the keys to Marte's car and give the two kilos to San, (Tr. p. 33, D.136). Therefore, it is María Carela undoubtedly delivering the drug to "San," José Lucia Henriquez.

Further, when Marte testified as to María Carela's participation in the pick-up of the twenty kilos in Las Croabas on June 27, 2002, he states that "[I] told María Carela to get out [of the car] and buy

something, so that she wouldn't be there present when we were dealing." (Tr. p. 35–30, D.135.) However, in cross examination he accepted that he and Quintero and María Carela went to Las Croabas "to deliver the money . . . the back pack and receive twenty kilos . . ." (Tr. p. 41, D.135.)

Lastly, Marte alleged to have no knowledge prior to the second debriefing as to a two-kilo transaction involving precisely María Carela.

The court provides very little credibility to co-defendant Quintero since on critical questions he answered evasively:

Q: [By Mr. Vaccaro] You indicated that you did not remember any other drug transaction with regards to Mr. Ward [referring to the June 27, 2002 drug transaction].

R: I do not recall any other.

Q: Have you ever met Mr. Ward before June 27, 2002?

R: I do not recall any other.

Q: Before June 27, 2002 did you receive any drugs from Mr. Richard Ward during the month of June.

R: I do not recall having received any.

(Tr. p. 40, D.136.) (The facts occurred from June 22 to June 27, 2002; the questions were asked on August 2003.)

After lunch recess and having consulted with his stand-by counsel, who was present since the beginning of his direct examination, the witness denied some of the questions stated above. The court provides no credibility to him.

Finally, this witness, Quintero, during the last re-cross examination admits having been picked up by El Negro in Santurce driving him to Fajardo on June 22, 2002 with El Negro ". . . but did not know it was for drugs . . ." Quintero clarified that "I was drunk that day." (Tr. p. 50–51, D.136.) Hence, he was in the car with El Negro in Las Croabas, Fajardo on June 22, 2002. (Richard Ward testifies as to another person in the car with El Negro but could not identify him.)

Quintero further admits that El Negro then gave him two kilos but he unequivocally accepted that they had picked up fifty-for kilos on this date, (Tr. p. 52–53, D.136). He further states that he did not inform Marte as to the fifty-four cocaine kilos. During his debriefing he "omitted" the fifty-four-kilo transaction with Miguel El Negro, further Quintero stressed that "suddenly at the moment I could have forgotten" this fact at the debriefing. (Tr. p. 54–55, D.136.)

The United States presented two witnesses. Agent Jorge L. Prendes and Daniel George Coxon a.k.a. Richard Ward.

## JORGE L. PRENDES

Agent Jorge L. Prendes was the agent involved in this case. He is assigned to the Bureau of Immigration and Customs Enforcement within the Department of Homeland Security. He participated in the debriefings of José Lucia Henriquez, Leonidas Alberto Quintero López, Rafael Marte and David Coxon a.k.a. Richard Ward. Marte was originally debriefed in May 27, 2003, he was later debriefed on August 7, 2003. He provided disclosure of the five kilo transaction and the ten-kilo transaction the date of his arrest and further the twenty-five kilos that he was arrested with following his drug pick-up in Las Croabas, Fajardo. He did not disclose the two-kilo transaction on the first debriefing. No other transaction was mentioned at the first debriefing. At the second debriefing he indicated that he learned the two-kilo transaction that María Carela had given to José Lucia Henriquez. He learned of this transaction at MDC Guaynabo; no further transaction was disclosed at the last debriefing. (See Ex. 1–2

of the U.S.A.) (Again, co-defendant Marte somehow "forgot" about a transaction involving María Carela.)

Agent Prendes learned about another transaction that occurred in June 2002 in the conspiracy. He learned through the May 20, 2003 debriefing of Mr. David Cox on that on June 22, 2002, Miguel Harris Pereida, a.k.a. Miguel El Negro, a.k.a. El Balarin, went to Las Croabas to pick-up drugs. El Negro arrived in a Pontiac Grand Prix with another person then unidentified. (Quintero admitted having been picked up by El Negro on June 22, 2002 and arriving at Las Croabas to pick up drugs.) Rafael Marte arrived in a four-wheel drive vehicle. They met Richard Ward. Richard Ward took from them (El Negro/Marte) the wheeled cooler and went to the sail boat and placed fifty-four kilos in the cooler. He returned; the cooler was given to El Negro who gave it to Marte. They tried to place the cooler in the truck of the Pontiac but the cooler would not fit so they placed it in the back seat of the Grand Prix. Mr. Marte was identified as being a participant in that transaction. After the arrest, while under custody at MDC Guaynabo, Richard Ward before his debriefing was approached by Marte and Leonidas Quintero and asked not to mention anything about Marte's participation in the June 22, 2002 incident. Quintero had been debriefed in January 20, 2003 and Richard Ward was debriefed on May 20, 2003. Quintero was first debriefed, then Richard Ward, and Rafael Marte last. Richard Ward did not however mention Mr. Marte at his debriefing on May 20, 2003 (Ex. 3 U.S.A.). The debriefing mentioned that two unknown individuals also accompanied Marte and Miguel El Negro. (Tr. p. 60–72, D.136.) The above facts coincided with the version provided in Ex. 3, except that Richard Ward added during his testimony in court that drugs were also placed in duffle type bags on the initial delivery of drugs (54 kilos). (discussed infra.)

█ Agent Prendes also learned of a video tape of Miguel Harris Pereida a.k.a. Miguel El Negro in the context of another investigation. (Tr. p. 73, D.136.) The video tape was under the circumstances of another separate investigation of money laundering as to Miguel Harris Pereida, El Negro, with two undercover agents. In the secretly taped meeting he spoke about the fifty-four kilo transaction on June 2002 and the twenty kilo transaction on June 27, 2002. The video was a taped money laundering meeting that occurred in July 1, 2002. The video was seen by the agent sometime in June 2003, (Tr. p. 73–74, D.136). The video reveals facts as to the drug deliveries of June 22, 2002 and June 27, 2002. Pursuant to El Negro's statement in the tape, the shipment originally arrived at Las Croabas and was picked up by him, Leonidas López Quintero, Rafael Marte, and another recruited person on June 22, 2002. El Negro provided a cooler, like an ice chest to Richard Ward. He instructed others to remain in separated places at Las Croabas "in case they got snagged by the police" "or apprehended by other person." Richard filled the ice chest but there was "cocaine missing." (Tr. p. 76, D.136). Miguel Harris Pereida took the cocaine and left. The cocaine was labeled "Amigo."

█ Although this statement as to the video is hearsay and the Richard Ward statements through agent Prendes are also hearsay they are both reliable and have "indicia of trust wordiness to have to warrant a finding of probable accuracy." *United States v. Rodríguez*, 336 F.3d 67, 70 (1st Cir.2003). The indicia of reliability is provided by the fact that co-defendant Quintero accepts that there was a cocaine fifty-four-kilo transaction in June 22, 2002.

Further, Richard Ward testified as to said fifty-four kilos delivery. The hearsay as to Richard Ward expressed by Prendes is totally cured since Richard Ward testified later in the hearing. Moreover, kilos of cocaine labeled with "Amigo" markings were in the Puerto Rico market in transactions that occurred on or around June 25 and 27, 2002 (the five kilo and ten kilo transaction and the two-kilo transaction), all with "Amigo" labeling. Hence, they must have been imported into Puerto Rico at a prior time. The hearsay evidence at sentencing authorized under *United States v. Zuleta–Alvarez*, 922 F.2d 33, 36–37 (1st Cir.1990); *United States v. Matos*, 328 F.3d at 34, *and by U.S.S.G. 6–A 1.3(a)* is admitted since the requirement of "sufficient indicia of trustworthiness" has been complied. The court further holds that generally at the sentencing phase the Federal Rules of Evidence do not apply. *United States v. Robinson*, 144 F.3d 104, 108 (1st Cir.1998); further, the right of confrontation as set forth in the Sixth Amendment does not attach at sentencing phase, *United States v. Tardiff*, 969 F.2d at 1287. The court adds that the United States on redirect examination of Agent Prendes clarified that the tape constituted an ongoing criminal investigation as to financial transactions. The United States opted not to disclose the contents of the tape at trial. (Tr. at 134–135, D. 136.)

At cross examination Prendes revealed that the video tape was an undercover meeting in a hotel room with two agents wherein Richard Harris Pereida, a.k.a. Miguel, El Negro was videotaped without his knowledge, (Tr. p. 79–84, D.136). Prendes also clarified why the United States did not balk at accepting the safety valve of defendants Quintero at the sentencing of Quintero which occurred on June 16, 2003 before District Judge DiClerico. Prendes stated that at the debriefing of Richard Ward (David Coxon) did not particularly identify Quintero although he stated that "two unknown individuals accompanied Marte and Miguel [El Negro]." See Ex. 3 U.S.A. (As stated before Quintero admitted on re-cross examination being on the car.) Hence, the debriefing of Richard Ward was not of any help, (Tr. p. 106, D.136). Further, the video tape of El Negro was not seen until "around June" of 2003 and the court adds presumptively seen by the agent after the sentencing date. (Mid June 2003). (Tr. p. 74, D.136.)

Prendes further added that there was another person involved in the transaction, Mr. Montero who was directing Mr. Richard Ward (Ex. 3, USA). Mr. Montero further provided to Richard Ward the sailing directions from St. Marteen to Tortola to Culebra and then Las Croabas, Fajardo. Montero was the person who gave the instruction to Richard Ward through the phone about delivering the initial load of fifty-four-kilos and releasing the final load of twenty-kilos. Montero had provided the names and phones of El Negro and Marte as the persons to contact once he arrived at Las Croabas, Fajardo, (testimony of Richard Ward discussed infra). He further ordered Richard Ward to collect the $185,000.00 from Marte, (Ex. 3, USA). Prior thereto Montero loaned to Richard Ward $29,000.00 to purchase the sailboat S/V Thirty Something and further loaned him $9,000.00 for repairs for a total of $38,000.00. The money owed by Richard Ward would be paid from the $60,000.00 to be earned by Richard Ward from the proceeds of the Las Croabas smuggling ventures. (Ex. 3, p. 3, USA.) Hence, the $60,000.00 owed to Montero would be paid from the $185,000.00.

Agent Prendes further testified that Ward informed him that defendant approached him not to testify about the fifty-four-kilo delivery (Tr. p. 120, D.136). The court does not have to make a trustworthy

determination pursuant to the case of *United States v. Rodríguez*, 336 F.3d at 71, since Richard Ward provided an equal testimony as to the identity of Montero and as to Marte's request as discussed infra.

## DAVID GEORGE COXON A.K.A. RICHARD WARD

Richard Ward testified on August 26, 2003 on behalf of the United States, (Docket No. 137). He testified without a cooperation agreement although he was granted prior to sentencing the "safety valve." His real name is David George Coxon. (Tr. p. 11, D.137.) He was born in Jarrow, England. He was convicted in England for various drug smuggling operations concerning narcotics hidden in beer cases in 1994. All ventures consisted of approximately thirty kilograms of hashish and fifteen to twenty kilograms of amphetamine. He was incarcerated for three months for drug smuggling. He participated in eight drug smuggling ventures as described above. He received an income of $5,000.00 per venture. He was placed on bail; subsequently skipped bail and fled to France and then sailed to South Africa. He latter sailed to Granada in 1999. He met Harry Montero in Carriacuo, Grenada and became involved in smuggling again by 2001. (See Ex. 3 p. 2, USA.)

The court restates the testimony of Mr. David George Coxon, a.k.a. Richard Ward a.k.a. El Gringo/Americano as to the critical deliveries of cocaine of June 22, 2002 and June 27, 2002. While he was in Grenada he was provided the phone number of Montero to call him if he were to be interested in drug ventures. Montero loaned Coxon money for the purchase and repairs of a sailboat as stated above. The smuggling sailing route was St. Marteen, Tortola, Culebra, and finally Las Croabas in Fajardo. He was given two names in Puerto Rico to contact. The two names were El Negro and Rafael Marte. (Tr. p. 14, D.137.) Prior to leaving St. Marteen, about one week prior to the arrest at Las Croabas, he was told to leave the boat early in the afternoon and return later in that same evening. Seventy-four (74) kilos of cocaine were placed inside the life raft on the S/V Thirty Something. He saw the drug for the first time in Puerto Rico. The kilos had markings of "Amigo." (Tr. p. 13–16, D.137.) Upon arrival to Fajardo, Las Croabas, Ward had to contact one of the two names given via a telephone numbers provided by Montero. "I was given a series of numbers, which were on my boat." These numbers were of Rafael Marte and El Negro. He also had the telephone number of Montero in St. Marteen. (Tr. p. 17, D.137.) He was an experienced sailor of twenty years and managed alone the sailboat, a Hunter 34 foot. He arrived at Las Croabas, Fajardo, on Friday June 21, 2002. He tried telephoning the persons at all the numbers and he could not contact anyone. (Tr. p. 18–19, D.137.) He attempted to use a telephone calling card that night but it did not work. Next day he went to Fajardo and again could not get anyone; he also called St. Marteen. He was told by St. Marteen (Montero) to "keep on ringing back" the numbers. He kept ringing them and calling St. Marteen every hour until he was told by St. Marteen that they were on the way. (Tr. p. 19, D.137.) He said they were arriving in a white Pontiac. They arrived in a white vehicle and started looking and asking for "Richard" in Spanish. Coxon told them he was "Richard." They all started walking toward the car and Negro pulled out his cellular phone and called St. Marteen. El Negro walked speaking over the cellular with Montero until both were next to a 4 × 4 wheeler a little off the road, there is when he met and saw Rafael Marte for the first time. El Negro eventually passed the phone to Richard and St.

Marteen (Montero) told him that he was with El Negro. El Negro spoke no English; Coxon was instructed by St. Marteen (Montero) to give El Negro fifty-four kilos (54) and hold back twenty (20) kilos. Together Marte and El Negro opened the back of the 4 × 4 wheeler and withdrew an ice box with wheels and a handle which they wanted Ward (Coxon) to take to the boat. (Tr. p. 20–20, D.137.)

Coxon originally balked. He had an argument with El Negro and Marte about taking the wheeled ice box (the court concludes through the Marina/Pier areas prior to taking the dinghy to reach the sail boat calling the attention of third parties), but eventually he took the wheeled ice chest to the boat and put the kilos of cocaine into the ice chest and two duffle bags. El Negro was waiting for Coxon as he maneuvered the dinghy up to shore. He provided the ice chest to Coxon and Coxon gave it to Marte who walked away. Coxon then passed him the two duffle bags also containing cocaine. Negro then walked away, and secured the dinghy. (Tr. p. 25, D.137.) Coxon duly identified in court Rafael Marte (Tr. p. 25, D.137). He had placed fifty-four kilos in the cooler and in two duffle bags. Twenty kilos remained in the boat—Coxon moved them to lockers inside the vessel, (Tr. p. 27–28, D.137). They moved to the trunk of the Pontiac (Negro's car). They could not fit the ice box in the trunk—they moved the ice box to the back seat. The two duffle bags went into the "boot," the trunk of the car. Coxon recognized "two other people who were in the background moving around." (Tr. p. 29, D.137.) (Quintero admitted being one of them; he also testified there was another whom he did not know.) (Tr. p. 50–53, D.136.) Mr. Coxon started to walk away and when he got further down he saw "both vehicles driving away." (Tr. p. 30, D.137.)

In the following days Coxon kept in constant communication with St. Marteen. Coxon was ordered "to wait." (Tr. p. 30, D.137.) Someone was supposed to come back with money to provide to Coxon, $185,000.00, and he was to provide them the final twenty kilos. Coxon waited for the money. Coxon had a valid motive "to wait," he was going to be paid $60,000.00 from said proceeds and from there he was to pay back Montero $38,000.00 previously loaned to purchase and repair the boat, Ex. 3, USA.

On June 27, 2002, Mr. Coxon was ordered to telephone Rafael Marte. He used a pay phone to make the call from Fajardo. Because he had a language problem, he requested two young girls who were next to him on the phone to help him out. He merely asked Marte to come down and that he would wait for him at the entrance of Las Croabas. (D.137, p. 31–32.) He returned from Fajardo to Las Croabas in a taxi, as he was walking into Las Croabas he saw the white car Toyota Echo driven by Marte, with Quintero and a young female in the car. He recognized Marte from the previous encounter. The female lady was the same female who was indicted in the case, Ana María Carela. The young lady got off the car. Marte or Coxon called St. Marteen using Marte's cellular phone. Coxon was instructed to take the money to the boat and deliver to them the remaining twenty kilos. Coxon took the money and counted it "roughly" in the boat. Coxon placed the money into two bags, also duffle bags type. Coxon returned to shore and placed the bags in the back of the white Toyota Echo. They went for a few beers and subsequently Marte, Quintero, and the lady left. Twenty minutes later he was arrested. (D.137, p. 33.) The May 20th, 2003 written debriefing of Mr. Coxon states that the arrest of the entire group of smugglers was detected by surveillance of members of the

Resident Agent in charge (RAIC) Fajardo, who observed a suspicious transaction between individuals in the vicinity of a Marina located in Fajardo. Coxon was arrested in a restaurant in Las Croabas vicinity; Marte/Quintero/Carela were arrested in the car still in the Fajardo area. "... A subsequent stop and search of the suspect's vehicle revealed approximately twenty kilograms of cocaine." (Ex. 3, p. 1, USA.)

On cross examination co-defendant Coxon admitted to having on various occasions lied prior thereto to the federal authorities. He lied when arrested in providing a false name and lied prior thereto for many years as to his true identity. He also lied as to birth and place of origin. He also lied as to his past address (he wrongly stated he lived for twenty years in a boat). He lied as to his identity until his current lawyer provided the court a birth certificate. He further had obtained a false passport. He further falsified a birth certificate as Richard Ward. Coxon further admitted to the criminal drug smuggling crime in England consisting of placing narcotics in beer cases.

He insisted in cross examination that he was provided originally the name of Marte and his telephone number to call in Puerto Rico by Mr. Henry Montero. (D.137, p. 41–52.) He had no idea as to the price per kilogram of the drug. (He was originally instructed by Montero to pick-up the money.) He was instructed by officials in Culebra to return to the Virgin Islands but he went to Fajardo anyway. When he arrived at Las Croabas he attempted to communicate with the local contacts but could not get through. He spoke to Montero and was told to wait. On the 22nd of June 2002 El Negro was the first to approach him. He was subsequently told by Montero through the cell phone on this date to release the fifty-four kilos to El Negro. El Negro was originally supposed to pay seventy-four kilos for $185,000.00, (D.137, p. 52–56). But, no money was provided for the drugs on June 22, 2002. (Tr. p. 57, D.137.) He recalls El Negro in the white Pontiac with somebody else in the passenger seat, (D.137, p. 53). El Negro opened the back of the SUV; they were both there (El Negro–Marte). He did not recognize Quintero there on the 22nd of June 2002, (D.137, p. 59). Coxon stated that he placed the kilos of cocaine in the cooler taken out of the SUV and into bags that were in the boat. He was not sure how many kilos were inside the ice chest and how many in the cooler; probably more in the bags that in the cooler, (D.137, p. 51–60). The ice chest did not fit in the trunk of the Pontiac and was placed in the back seat. The bags were placed in the trunk. The cooler was two feet by eighteen inches. (The court recalls as stated by AUSA Vaccaro that when extending his arms and showing the size of the ice chest, the ice chest seemed to be longer in size than described by the witness, (D.137, p. 61)). Coxon admitted to using of cocaine. Coxon was to receive for the drugs a total of $185,000.00; his share was to be $60,000.00, (D.136, p. 63).

The court notes that since no money was produced on June 22, 2002, Montero did not authorize the release of all the seventy-four kilos; only fifty-four were released on consignment.

On the 27th of June 2002 Coxon was advised by Montero to collect the $185,000.00 and deliver the last twenty kilos. Marte and Quintero made the pick-up on June 27, 2002, subsequently after Quintero/Marte/Carela were arrested, two agents took Coxon outside the restaurant where he had been arrested and Marte identified him. Coxon does not blame Marte for his arrest because "they actually had an undercover agent at the scene who

had witnessed the transaction," (D.137, p. 65–66). Coxon did not recall Leonidas Quintero on the scene on June 22, 2002 (although he identified two unknown persons as being there; further Quintero admitted being there on June 22, 2002). On June 27, 2002, Coxon had to request approval from Montero to deliver the remaining twenty-kilos and was told to collect simultaneously $185,000.00. Referring to Moreno he stated that "I needed approval for every little thing I did . . . whatever I did I had to make sure that I was doing the correct thing . . . He told me by the phone that I had to collect one hundred and eighty-five thousand dollars." (Tr. p. 68, D.137.) Coxon further stated that Montero did not originally tell him before departing St. Marteen, the amount of money he had to collect. He was, however, advised the amount of drugs in the sail boat, (Tr. p. 68–69, D.137). The money was roughly counted. (Tr. p. 71, D.137.)

On redirect examination Mr. Coxon explained that from the $185,000.00 he was to receive as part of his share $60,000.00, (Tr. p. 78, D.137). Coxon further testified that Mr. Marte approached him at the prison when they had already been together for fourteen or fifteen months (correctly about eleven months). Mr. Marte asked Mr. Coxon through an inmate interpreter that Coxon should only state that Marte was in Las Croabas on the second occasion (June 27, 2002) notwithstanding having been there on two occasions. (Tr. p. 81–82, D.137.) He spoke to him on several occasions as to the request to omit the first delivery. The request was made prior to Coxon's debriefing. Coxon later told him he had not stated the two encounters but

was untruthful because Coxon spoke to the government as to Marte's participation in the delivery of June 22, 2002. Further, after the hearing of August 21, 2003, "five or six Dominican guys passed into the cell and they were more or less telling me that I had to tell the government that he was there only once." Coxon responded that they knew nothing about the case and it was his decision in his case. Then "ten or twelve Puerto Rican guys come in and more or less broke it up just to make sure that I was okay," (Tr. p. 83, D.137).[3] Finally, Coxon stated that he knew by the evidence provided to his lawyer that he was observed by an agent on June 27, 2002, making a suspicious delivery of two duffle bags, (Tr. p. 84, D.137). The statement coincides with his debriefing statement, Ex. 3, USA. On re-cross Coxon admits not having told Agent Prendes about Marte's request pre debriefing of not wanting him to state the initial delivery of cocaine, (Tr. p. 85, D.137). Coxon stated that he did not speak to agent Prendes to prepare for the case, (Tr. p. 87, D.137). The agent recalls however the testimony of Coxon as to Marte's request that no mention be made of Marte's participation in Las Croabas on the June 22, 2002 delivery. (See infra.)

The U.S. Attorney advised that he had requested the change of Marte at MDC Guaynabo effective the date of the hearing (August 26, 2003) since on that date Coxon had testified as to the delivery of June 22, 2002, (Tr. p. 88–89, D.137).

## REBUTTAL

Agent Prendes was recalled as rebuttal witness and stated that Coxon did state to

---

**3.** Marte failed to deny that he made several request to Coxon not to mention the June 22nd, 2002 delivery wherein he participated with El Negro. (See rebuttal at Tr. p. 106–108, D. 137.) At his rebuttal Marte further recognized that he had not failed to state anything important during the hearing as to the testimony of Coxon and Prendes. (Tr. p. 111, D.137.)

him that Marte requested before the debriefing that Marte's participation in the June 22, 2002 delivery of fifty-four kilos not be mentioned. Prendes did not include the statement in the debriefing. (Tr. p. 93–93, D.137.) As to the arrest of Coxon on June 27, 2002, he was observed by task force Falú who was at Las Croabas and observed the suspicious transaction. Marte identified Coxon as a second safety measure. (Tr. p. 93–94, D.137.)

Finally, Mr. Marte was allowed by the court to testify also in rebuttal to direct evidence stated by Mr. Coxon. Mr. Marte denies participating in the June 22, 2002 delivery. (Tr. p. 106–108, D.137.) Mr. Marte stated that the motive of Coxon to testify against Marte was that Marte identified Coxon on June 27, 2002, (Tr. p. 108, D.137). Marte failed to deny Coxon's testimony about Marte's attempt to silence him as to Marte's prior participation on the June 22, 2002 delivery of drugs.

## CREDIBILITY FINDINGS

1. The cocaine kilos labeled "Amigo" were in the market in Puerto Rico prior to the delivery of twenty kilos on June 27, 2002, (testified by Marte and Quintero—drug transaction of five kilos; transaction of two kilos (María Carela delivers drugs to "San")); ten kilo transaction in the Metropolitan area of San Juan the date of the arrest.

2. There was a transaction dated June 22, 2002, wherein fifty-four kilos in bricks of cocaine were delivered from David Coxon to El Negro; the cocaine was also labeled "Amigo." (Testified by David Coxon and Leonidas Quintero; also testified by Agent Prendes upon information by Ward and by observation of a video tape of El Negro, both reliable hearsay under *United States v. Rodriguez*, 336 F.3d at 70.)

3. Rafael Marte was present on June 22, 2002, at Las Croabas, Fajardo, at the delivery of the fifty-four kilos of drugs, aiding and abetting El Negro. He actually participated by driving another car to the transaction, a 4 × 4 vehicle, and by carrying the ice chest from the dinghy to the white Pontiac Grand Prix wherein the drugs were placed. Testified by David Coxon and by Agent Prendes under reliable hearsay evidence standards. *United States v. Rodriguez*, 336 F.3d at 70.

A. In addition to the demeanor of the Coxon as a superior witness and more credible to the court than the testimonies of co-defendants Marte and Quintero, the following facts provide superior credibility to Coxon's testimony:

1. Coxon provided a debriefing prior to Marte and had nothing to gain then early in the case by including Marte as a participant. He did not testify under a cooperation agreement. He had already been sentenced when he testified in court.

2. Coxon had no motive to lie. The motive advanced by defendant Marte, that he blew the whistle on Coxon as a smuggler is a non motive because the evidence is clear that the transaction was originally observed by an agent who proceeded to ask for back up aid to arrest; some agents arrested Marte/Quintero and Carela riding in the car nearby in Fajardo; others arrested Coxon in Las Croabas, Fajardo. Marte was brought in later as an additional identification safety measure as to Coxon. Coxon clearly understood since the inception of arrest, (Ex. 3, p. 1 USA), that he was detected by agent observation and not by Marte's cooperation. Further, the confiscation of the vessel is not an additional motive to be analyzed at ad nauseam since the vessel was totally owed to Montero. When Coxon lost the money by forfeiture paid by Marte on June 27, 2002, he also lost the boat owed to Montero. Cox-

on was to be paid $60,000.00 from the $185,000.00 to be earned as part of the smuggling venture. ($38,000.00 was owed to Montero for the boat and boat related repair loans.)

3. Quintero although accepting that he did participate in the fifty-four-kilo delivery of June 22, 2002, was extremely evasive in answering simple questions as discussed by the court infra. He is not granted credibility as to the fact that Marte was not there. Further, Quintero allegedly was drunk on June 22, 2002 and had poor memory as to the facts of this date. (He unequivocally accepted that he participated in the June 22, 2002 pick up at Las Croabas.)

4. Marte attempted to alter the testimony of Coxon as to the fact that Marte actively participated in the fifty-four-kilo delivery of June 22, 2002. The request was made several times personally by Marte and through fellow Dominican national inmates. He never denied this fact although granted ample opportunity at his rebuttal testimony as recognized by him upon questions from counsel.

5. Marte played a leading role in the conspiracy and had the confidence of El Negro. Marte was the person that carried the money and drove the vehicle to pay $185,000.00 to Coxon on June 27, 2002. He had an apparent superior trust with El Negro. (Quintero had lost confidence because he was drunk on the critical day, June 22, 2002.) El Negro or Montero selected Marte (from the group of smugglers) as the person to be called by Coxon, (Tr. p. 31–32, D.137).[4]

"Q: And what instruction did you get on that date.

A: He said I should telephone Rafael Marte and arrange a meeting."

Further, the court seriously doubts that El Negro would provide $185,000.00 to Quintero or Marte on June 27, 2002, to deliver to a person with an identification of a man wearing "short pants, a skirt and sun glasses," (Tr. p. 27, D.135), moving around in Las Croabas which could be applied to many persons in a place where there is a Marina/Pier facility on a Saturday. (June 27, 2002 was a Saturday.) The logical answer is that Marte knew him as he had picked up from Coxon the fifty-four kilos prior thereto with El Negro on June 22, 2002. Since El Negro was present with Marte before in Las Croabas and Marte dealt with Coxon on that date, June 22, 2002, he was the logical choice.

6. Notwithstanding that Coxon lied about his identity, had a false passport, a false birth certificate, was a prior convicted smuggler in Europe, the court provides credibility to him since the key is not past lies but whether or not he provided truthful testimony at the debriefing and in the trial.

The court notes the following contradictions of Coxon between the written debriefing, (Ex. 3 USA), and the testimony in court. Notwithstanding, the credibility of Coxon prevails over the testimony of Marte:

(A) At the debriefing he stated that the fifty-four kilos of cocaine were placed at a cooler/ice chest, placed on the back seat of the white Pontiac Grand Prix after the cooler did not fit in the trunk of the car. In his testimony in court he stated that the fifty-four kilos were placed in the ice chest and two duffle bags. The ice chest was placed in the back seat of the Grand Prix

---

4. The court is not clear if "he" refers to El Negro or Montero—both persons were then providing instructions to Coxon.

after attempting to fit it in the trunk. The duffle bags were placed on the trunk. The court does not consider the difference in testimony "material," the critical fact is that there was a fifty-four-kilo delivery of cocaine on June 22, 2002, as accepted by co-conspirator Quintero and that Marte was there as stated by Coxon and stated in the video of El Negro observed by Agent Prendes.

(B) Coxon did not recall advising Agent Prendes about the request of Marte to Coxon for the later not to testify as to the fifty-four-kilo delivery on June 22, 2002, and Marte's participation therein. Prendes recalls having received the information, but simply did not then consider the matter important because he was emphasizing and writing at the debriefing the facts of the transaction of June 22, 2002. (Tr. p. 92–93, D.137.) The latter may be material as to whether or not Marte made the request to Coxon to perjure himself but does not affect Coxon's overall credibility relating to the facts of June 22, 2002 as to the rest of his testimony.

7. Finally, the court notes that not only was Quintero evasive, but also Marte himself was not truthful in his testimony. Marte at the hearing provided testimony diminishing or evading María Carela's responsibility in the conspiracy as depicted in the this Opinion and Order.[5] The participation of co-defendant conspirator María Carela is a material fact under *United States v. Matos,* 328 F.3d at 42.

The court, therefore, concludes that co-defendant Marte has failed to make a complete and truthful disclosure as required under *United States v. Matos,* 328 F.3d at 37–40. The non-disclosure of his participation in a fifty-four (54) kilo delivery out of a total of seventy-four (74) kilos handled by the conspiracy, in a period covering shortly over one week of smuggling, constitutes a "material" omission and, hence, **a finding of compliance as to "safety valve" by co-defendant Rafael Marte is DENIED.**[6]

IT IS SO ORDERED.

At San Juan, Puerto Rico, this 25 day of February 2004.

---

**5.** The court is conscious that Marte was having a relationship with María Carela, (Tr. p. 110, D.137). However, complete and truthful information must be provided at the safety valve as to material facts.

**6.** The co-defendant Rafael Marte is therefore facing a statutory minimum sentence of ten years and a potential enhancement of two additional points for having provided intentional false testimony as to a material fact pursuant to U.S.S.G. 3C1.1. See *United States v. Villarman–Oviedo,* 325 F.3d 1, 6 (1st Cir. 2003).